# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RICHARD R. QUINT, | ) | CASE NO. 3:21-cv-1695 (KAD) |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARTIN, *et al.*, | ) | JUNE 6, 2025 |
| *Defendants.* | ) | |

## <u>MEMORANDUM OF DECISION</u>
### RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 117)[1]

Kari A. Dooley, United States District Judge:

Plaintiff Richard R. Quint ("Quint") filed this civil rights action pursuant to 42 U.S.C. § 1983, alleging violations of his constitutional rights as a pretrial detainee. Following initial review of the operative Third Amended Complaint, the following claims remain: Fourteenth Amendment claims for deliberate indifference to medical needs against Defendants Jackson, Parker, Stephanie, Rader, Phillips, Blumberg, and Oei arising out of their alleged failure to comply with doctor's orders regarding his medication and against Defendants Tanisha and Jackson for failure to comply with the doctor's order regarding his need for a wheelchair. *See* Initial Review Order, ECF No. 42 at 18.[2]

Defendants Blumberg, Tanisha, Jackson, Parker, and Stephanie ("Defendants") seek summary judgment on three grounds: Quint failed to exhaust his administrative remedies before commencing this action, Quint's Fourteenth Amendment deliberate indifference to medical needs claims fail as a matter of law as there is no evidence that any doctor had ordered a wheelchair or

---

[1] This motion was filed by Defendants Blumberg, Tanisha, Jackson, Parker, and Stephanie. Defendant APRN Elizabeth Oei has filed her own motion for summary judgment. *See* ECF No. 132. Defendants indicate that Defendant Jackson's name is misspelled as Jacksen in the Third Amended Complaint. Defs.' Local Rule 56(a) Statement ("LRS"), ECF No. 117-2, at ¶ 4 n.1. The Court uses the correct spelling as indicated by Defendants.

[2] All claims against Defendants Rader and Phillips were subsequently dismissed. *See* Mem. of Decision, ECF No. 106 at 8.

medication at the dosage alleged during the relevant time period, and, in any event, Defendants are entitled to qualified immunity. Quint's opposition was due by October 10, 2023. Despite the passage of many months, to date, he has not responded to the motion.[3] Because Quint was aware of the motion but has chosen not to respond, the Court considers the motion to be unopposed.[4] For the following reasons, the motion for summary judgment, ECF No. 117, is GRANTED.

**Standard of Review**

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.,* 875 F.3d 107, 113–14 (2d Cir. 2017). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage*, 875 F.3d at 113–14 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Which facts are material is determined by the substantive law. *Anderson*, 477 U.S. at 248. "The same standard applies whether summary judgment is granted on the merits or on an affirmative defense. . . ." *Giordano v. Market Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010).

The moving party bears the initial burden of informing the Court of the basis for its motion and identifying the admissible evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue

---

[3] Quint was aware of his need to respond to the motion, because on September 25, 2023, six days after the motion was filed, Quint sought appointment of pro bono counsel to assist him with his opposition. The Court denied the motion without prejudice, but no response has been forthcoming. Even where a party has not responded to a motion for summary judgment, the non-movant does not "risk a default judgment." *Jackson v. Federal Express*, 766 F.3d 189, 195 (2d Cir. 2014); *Vermont Teddy Bear v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004). The Court is required to "examine the movant's statement of undisputed facts and the proffered record support and determine whether the movant is entitled to summary judgment." *Jackson*, 766 F.3d at 197.

[4] The Court notes that Quint is not an inexperienced litigant, having filed twenty cases in this district.

for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). He cannot "rely on conclusory allegations or unsubstantiated speculation" but "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 44 (2d Cir. 2015) (quotation marks and citation omitted). To defeat a motion for summary judgment, the nonmoving party must present such evidence as would allow a jury to find in his favor. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

Although the Court is required to read a self-represented "party's papers liberally and interpret them to raise the strongest arguments that they suggest," *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015), "unsupported allegations do not create a material issue of fact" and do not overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

**Facts**[5]

Inmates are permitted a wheelchair only upon a doctor's order. Defs.' LRS, ECF No. 117-2 at 1 ¶ 9. When Quint was admitted to the Department of Correction at Bridgeport Correctional Center ("BCC") in January 2021, his medical history included a fractured pelvis which had been surgically repaired. *Id.* at 2 ¶ 7. On admission, he was able to ambulate with the assistance of a

---

[5] The facts are taken from Defendants' Local Rule 56(a) Statements and supporting exhibits. Local Rule 56(a)2 requires the party opposing summary judgment to submit a Local Rule 56(a)2 Statement which contains separately numbered paragraphs corresponding to the Local Rule 56(a)1 Statement and indicating whether the opposing party admits or denies the facts set forth by the moving party. Each denial must include a specific citation to an affidavit or other admissible evidence. D. Conn. L. Civ. R. 56(a)3.

Although Defendants informed Quint of his obligation to respond to the motion for summary judgment and the contents of a proper response, *see* Defs.' Notice to Self-Represented Litigant Concerning Motion for Summary Judgment as Required by Local Rule of Civil Procedure 56(b), ECF No. 117-3, Quint has not done so. The fact that Quint is unrepresented does not excuse him from complying with the Court's procedural and substantive rules. *See Evans v. Kirkpatrick*, No. 08-CV-6358T, 2013 WL 638735, at *1 (W.D.N.Y. Feb. 20, 2013) (citing *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006); *see also Jackson v. Onondaga Cnty.*, 549 F. Supp. 2d 204, 214 (N.D.N.Y. 2008) ("when a plaintiff is proceeding pro se, all normal rules of pleading are not absolutely suspended" (citation and internal quotation marks omitted)). Thus, Defendants' facts, when supported by the evidence of record, are deemed admitted. *See* D. Conn. L. Civ. R. 56(a)3 ("Failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1, or in the Court imposing sanctions. . . .").

cane. *Id*. at ¶ 8.

Quint was transferred to Corrigan Correctional Center ("Corrigan") on March 18, 2021. *Id*. at ¶ 10. At that time, Dr. Blumberg had entered an order for a cane but not a wheelchair. *Id*. at 3 ¶ 11. At Corrigan, Dr. Rader ordered a rolling walker for Quint in addition to the cane but did not order a wheelchair. *Id*. at ¶ 12. In January 2022, Quint was seen by Dr. Maletz on referral from Dr. Rader. *Id*. at ¶ 13. Dr. Maletz observed Quint walking in his cell without any assistive device and did not order a wheelchair at that time. *Id*. at ¶¶ 14, 16. Quint returned to BCC on February 9, 2022. *Id*. at ¶ 17.

Upon readmission to BCC, APRN Elizabeth Oei assessed Quint and noted that he moved slowly without assistance and that he did not need a wheelchair. *Id*. at 3–4 ¶ 19. Dr. Blumberg did not order a wheelchair for Quint upon his readmission to BCC. *Id*. at 3 ¶ 18.

Nurse Tanisha saw Quint five times while he was at BCC: February 10, 2022, February 11, 2022, February 13, 2022, February 27, 2022, and April 7, 2022. *Id*. at ¶¶ 20, 23. During this time there was no order for a wheelchair and she observed him walking in his cell. *Id*. at ¶¶ 21–27. On February 10, 2022, as instructed by Dr. Blumberg, Nurse Tanisha offered Quint a cane, but he refused the cane and demanded a wheelchair. *Id*. at ¶ 22.

On April 11, 2022, Quint was transferred to New Haven Correctional Center ("NHCC"). *Id*. at 5 ¶ 30. At that time, there was no order for a wheelchair and Nurse Jackson therefore did not take a prescribed wheelchair from Quint upon his arrival. *Id*. at ¶¶ 31–32.

Dr. Maletz ordered a wheelchair for Quint on April 25, 2022 and he was permitted to use the wheelchair without incident after that date. *Id*. at ¶ 33.

*Alleged Denial of Medication*

Quint was first prescribed Oxycodone 5 mg, three times per day, by Dr. Rader at Corrigan

in June 2021. *Id*. at 6 ¶ 36. On September 16, 2021, at Quint's request, Dr. Rader increased the dosage to 10 mg, three times per day, but told Quint that the increased dosage was only for a short time while other non-narcotic pain medications were tried. *Id*. at ¶¶ 38–39. This order was still in place when Quint returned to BCC in February 2022. *Id*. at ¶ 40.

Dr. Blumberg saw Quint only two times: February 10, 2022, and February 22, 2022, before she went on administrative leave. *Id*. at ¶ 41. At no time did she alter Dr. Rader's order. *Id*. at 7 ¶ 42.

APRN Oei, in consultation with Dr. Rader, determined it was medically appropriate to begin weaning Quint from Oxycodone while initiating other medications and treatment. *Id*. at ¶ 43. From February 14, 2022, through March 11, 2022, Quint was tapered off Oxycodone. *Id*. at ¶ 45. Quint disagreed with this decision and refused to take the other medications. *Id*. at ¶ 46.

When Quint was transferred to NHCC on April 11, 2022, he did not have an active order for Oxycodone. *Id*. at ¶ 47. On April 25, 2022, Dr. Maletz prescribed Endocet 5-325, which is comprised of 5 mg of Oxycodone and 325 mg of Acetaminophen. *Id*. at ¶¶ 48–49. Because NHCC did not have a supply of Endocet, APRN Silva ordered that Quint receive 5 mg of Oxycodone and 325 mg of Acetaminophen. *Id*. at ¶ 50. APRN Silva ordered that the medication be given "q8hr prn," which means every eight hours as needed. *Id*. at 8 ¶ 51. Under this frequency order, nursing staff would provide the medication when requested as long as it had been at least eight hours since the last dose. *Id*. at ¶ 52. Nurses Jackson, Parker, and Stephanie distributed Quint's medication in accordance with this practice. *Id*. at ¶ 53.

*Exhaustion of Administrative Remedies*

Janine Brennan, a health services administrative remedies coordinator, reviewed the DOC database for all health services administrative remedies filed by Quint, at all correctional facilities,

from January 1, 2021 to January 1, 2023. *Id*. at 9 ¶ 56. Quint filed his first health services administrative remedy during this period on June 8, 2022. *Id*. at ¶ 57. That remedy sought review of a diagnosis or treatment and did not mention his claims that staff took his wheelchair or were not "following doctor's orders." *Id*. at ¶¶ 58–60. Other administrative remedies he filed were rejected because Quint did not comply with the procedural requirements for filing a health services administrative remedy. *Id*. at 10 ¶ 61.

**Discussion**

Defendants move for summary judgment on the grounds that Quint did not properly exhaust his administrative remedies, that the record evidence does not show that any defendant was deliberately indifferent to his medical needs by ignoring a doctor's orders for a wheelchair or medication in the dosage alleged, and they are otherwise entitled to qualified immunity.

*Exhaustion of Administrative Remedies*

The Prison Litigation Reform Act ("PLRA") requires a prisoner pursuing a federal lawsuit to exhaust available administrative remedies *before* a court may hear his case. *See* 42 U.S.C. § 1997e(a) (providing in pertinent part that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); *see also Ross v. Blake*, 578 U.S. 632, 635 (2016). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The PLRA requires "proper exhaustion": the inmate must use all steps required by the administrative review process applicable to the institution in which he is confined and do so

properly. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out and doing so properly"). "Exhaustion is mandatory—unexhausted claims may not be pursued in federal court." *Amador*, 655 F.3d at 96; *see also Jones*, 549 U.S. at 211.

Prisoners "cannot satisfy the PLRA's exhaustion requirement solely by . . . making informal complaints" to prison officials. *Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007); *see also Day v. Chaplin*, 354 F. Appx. 472, 474 (2d Cir. 2009) (summary order) (affirming grant of summary judgment for failure to exhaust administrative remedies and stating that informal letters sent to prison officials "do not conform to the proper administrative remedy procedures…"); *Timmons v. Schriro*, No. 14-cv-6606 (RJS), 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015) ("The law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA.").

The Supreme Court has held that the requirement for proper exhaustion is not met when a grievance is not filed in accordance with the deadlines established by the administrative remedy policy. *Jones*, 549 U.S. at 217–18 (citing *Woodford*, 548 U.S. at 93–95). In addition, exhaustion of administrative remedies must be completed before the inmate files suit. *Baez v. Kahanowicz*, 278 F. Appx. 27, 29 (2d Cir. 2008). Completing the exhaustion process after the complaint is filed does not satisfy the exhaustion requirement. *Neal v. Goord*, 267 F.3d 116, 122–23 (2d Cir. 2001).

Special circumstances will not relieve an inmate of his obligation to comply with the exhaustion requirement. An inmate's failure to exhaust administrative remedies is only excusable if the remedies are in fact unavailable. *See Ross*, 578 U.S. at 642. The Supreme Court has determined that "availability" in this context means that "an inmate is required to exhaust those,

but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Id.* (quotation marks and internal citations omitted).

The *Ross* Court identifies three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id.* at 643–44. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id*. at 643. "Next, an administrative remedy scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id*. Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643. The Second Circuit has noted that "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams v. Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016). In considering the issue of availability, however, the Court is guided by these illustrations. *See Mena v. City of New York*, No. 13-cv-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Exhaustion of administrative remedies is an affirmative defense. Thus, the defendant bears the burden of proof. *See Jones*, 549 U.S. at 216. Once the defendant puts forth evidence that administrative remedies were not exhausted before the plaintiff commenced the action, the plaintiff must put forth evidence that administrative remedy procedures were not available to him under *Ross*, or evidence which shows that he did exhaust his administrative remedies. *See Smith v. Kelly*, 985 F. Supp. 2d 275, 284 (N.D.N.Y. 2013) ("[O]nce a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those administrative remedies, the plaintiff must then 'counter' the defendant's assertion by showing exhaustion [or] unavailability").

Exhaustion of claims regarding medical needs is governed by DOC Administrative Directive 8.9. *See* Ex. H-1, ECF No. 117-12. Administrative Directive 8.9 provides Health Services Review procedures to address two types of issues or claims related to the medical, dental, or mental health care of an inmate: (1) diagnosis and treatment issues and (2) administrative health care issues involving a procedure, practice, policy, or the improper conduct of a health services provider. *See* Administrative Directive 8.9(6)(i) & (ii).

Before filing a health services administrative remedy, the inmate must attempt to seek informal resolution by speaking with the appropriate staff member or submitting an inmate request form to the appropriate staff member. *See id.* at 8.9(6)(b)(ii). The inmate will be provided a response within fifteen business days after receipt of the written request. *See id.* If the inmate is not satisfied with the response to the written request, he may file a health services administrative remedy. *See id.* at 8.9(6)(b)(iii). The completed Level 1 remedy must include a copy of the inmate request form or explain why the form is not attached. *See. id.* at 8.9(6)(b)(iii)(2). The Level 1 remedy form must be filed within thirty calendar days of the occurrence or discovery of the cause or reason for the request for health services administrative remedy. *See id.* at 8.9(6)(b)(iii)(4). Upon receipt, the health services administrative remedy is reviewed for compliance with the provisions in Administrative Directive 8.9. If the request is not in compliance, it is rejected. *See id.* at 8.9(6)(b)(i). The inmate is afforded five calendar days to correct the procedural deficiency and refile the remedy. *See id.* at 8.9(6)(c)(ii)(2)(a)(i)(1).

For a diagnosis and treatment remedy, the inmate "shall concisely explain the specific diagnosis or treatment decision and specify the date of diagnosis or treatment. The inmate shall explain how he or she is dissatisfied with the diagnosis and treatment, how he or she has been affected, and concisely state the resolution desired." *Id.* at 8.9(6)(c)(i)(1). Upon receipt of a

diagnosis and treatment remedy, the health services administrative remedy coordinator ("HSARC") consults the provider who made the decision to determine what action, if any, should be taken. *See id.* at 8.9(6)(c)(i)(2)(a). If the provider decides that the existing diagnosis or treatment is appropriate, the remedy is denied and may not be appealed. *See id.*

If the remedy is not in compliance, it will be rejected and, if correction is possible, the inmate will be afforded five days to correct the defect and resubmit the remedy. *See id.* at 8.9(6)(c)(ii)(2)(a)(i). If the inmate is not satisfied with the response or has not received a response within thirty business days, the inmate may file a Level 2 appeal. *See id.* at 8.9(6)(c)(ii)(4)(a) & (iii)(1).

Defendants have submitted evidence that Quint did not file *any* administrative remedies, let alone administrative remedies regarding the remaining claims in this action, *i.e.*, that Dr. Blumberg discontinued his pain medication, that staff ignored doctor's orders that he be provided a wheelchair, and that staff ignored doctor's orders that he be given Oxycodone 10 mg three times per day, between October 20, 2021, and June 8, 2022. *See* Ex. H-2, ECF No. 117-13. The record evidence demonstrates Quint's claims relate to events that occurred in February and April 2022, and thus, the remedies he filed in June 2022, even if they could arguably be read to address the claims in this case, were untimely. Quint has not otherwise submitted any evidence showing that he did exhaust his remedies or that remedies were not available to him. Defendants' motion for summary judgment is granted on the ground that Quint failed to exhaust his administrative remedies.

*Deliberate Indifference to Medical Needs*

Even if Quint had properly exhausted his administrative remedies, the record evidence does not support his substantive claims.

To state a Fourteenth Amendment claim for deliberate indifference to serious medical needs, a detainee first must show that his medical need was "sufficiently serious." *See Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). This inquiry "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* A "sufficiently serious" deprivation can exist if the detainee suffers from an urgent medical condition that can cause death, degeneration, or extreme or chronic pain. *See Brock v. Wright*, 315 F.3d 158, 162–63 (2d Cir. 2003); *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). A medical condition may not initially be serious, but may become serious because it is degenerative and, if left untreated or neglected for a long period of time, will "result in further significant injury or the unnecessary and wanton infliction of pain." *Harrison v. Barkley*, 219 F.3d 132, 136–37 (2d Cir. 2003). The Second Circuit has identified several factors that are "highly relevant" to the question of whether a medical condition is sufficiently serious, including: "an injury that a reasonable doctor or patient would find important and worth of comment or treatment; the presence of a medical condition that significantly affects the individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).

The conduct of the defendant is considered objectively. "[T]he pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnel v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017). Negligence is insufficient to satisfy this component. *Id.* at 36 (detainee must show that defendant acted recklessly or intentionally, not merely negligently). Courts frequently consider the "degree of risk associated

with the negligent treatment," and have found reckless conduct where the plaintiff did not receive treatment for a documented injury. *King v. Falco*, No. 16 CV 6315 (VB), 2018 WL 6510809, at *9 (S.D.N.Y. Dec. 11, 2018) (citing cases).

Defendants assume, for purposes of their motion for summary judgment, that Quint has a serious medical need based on his pelvic injury, but argue that Quint cannot show that they were deliberately indifferent to his needs. The Court agrees.

### Denial of Wheelchair

Quint contends that Nurses Tanisha and Jackson took away his prescribed wheelchair, on February 10, 2022, and April 11, 2022, respectively. Quint's medical records, however, indicate that Dr. Maletz did not prescribe a wheelchair for him until April 25, 2022. Because no medical order for a wheelchair existed when Nurses Tanisha and Jackson allegedly denied Quint said wheelchair, there is no basis on which they would have understood that their refusal would pose an excessive risk to Quint's health or safety. Defendants' motion for summary judgment is also granted on this claim as to Defendants Tanisha and Jackson.

### Denial of Medication

When Quint returned to BCC in February 2022, Dr. Rader's temporary order for 10 mg of Oxycodone, three times per day, was in effect. Quint's medical records indicate that Dr. Blumberg saw Quint only twice that month and did not alter that prescription at either visit. Thus, Quint's claim that Dr. Blumberg was deliberately indifferent to his medical needs by discontinuing the 10 mg Oxycodone prescription fails on the undisputed record.

Rather, APRN Oei, in consultation with Dr. Rader, decided to wean Quint from Oxycodone and try a different medication. Quint's medical records show that his Oxycodone prescription was gradually reduced: Oxycodone 5 mg one tablet three times per day from February

18, 2022, to February 25, 2022; Oxycodone 5 mg one tablet twice per day from February 25, 2022, to March 4, 2022; and Oxycodone 5 mg one tablet once per day from March 4, 2022, to March 11, 2022. *See* Ex. I, ECF No. 117-15 at 48.

Beginning on March 11, 2022, Quint had no active prescription for Oxycodone until April 25, 2022, when Dr. Maletz prescribed Endocet. Although Dr. Maletz prescribed Endocet, one tablet three times per day for pain, *id.* at 104, APRN Silva substituted Endocet with Oxycodone 5 mg and Acetaminophen 325 mg to be distributed every eight hours as needed. *Id*. at 108. This change required Quint to request each dose of medication.

Thus, Quint had no prescription for 10 mg of Oxycodone at any time after February 18, 2022. Because Dr. Maletz never prescribed Oxycodone 10 mg, there is no factual basis for Quint's claim that Defendants Jackson, Parker, and Stephanie failed to follow such an order. The medical records show that these Defendants provided Quint pain medication at the prescribed levels and Quint has presented no evidence suggesting that any Defendant was aware that such a regimen would pose an excessive risk to Quint's health or safety. Defendants' motion is granted on this basis as well.

**Conclusion**

Defendant Blumberg, Jackson, Parker, Stephanie, and Tanisha's Motion for Summary Judgment, ECF No. 117, is GRANTED.

**SO ORDERED** at Bridgeport, Connecticut, this 6th day of June, 2025.

 */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE